IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| AMANDA P. AND CASEY P. AS | § | |
| PARENTS/GUARDIANS/NEXT | § | |
| FRIENDS OF T.P., A MINOR | § | |
| INDIVIDUAL WITH A | § | |
| DISABILITY, | § | CIVIL NO. 6:19-CV-00197-ADA |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | |
| COPPERAS COVE INDEPENDENT | § | |
| SCHOOL DISTRICT, | § | |
| *Defendant.* | § | |

**ORDER GRANTING DEFENDANT'S MOTION FOR JUDGMENT ON THE
ADMINISTRATIVE RECORD AND DENYING PLAINTIFFS MOTION FOR
JUDGMENT ON THE ADMINISTRATIVE RECORD**

Before the Court is Defendant's Motion for Judgment of the Administrative Record (ECF No. 34), Plaintiffs' Motion for Judgment on the Administrative Record (ECF No. 35), Plaintiffs' Response to Defendant's Motion (ECF No. 36), Defendant's Response to Plaintiffs' Motion (ECF No. 37), Defendant's Reply (ECF No. 38), and Plaintiffs' Reply (ECF No. 39). After carefully reviewing the parties' briefs, case file, and applicable law, the Court has determined that Defendant's Motion should be **GRANTED**, and Plaintiffs' Motion should be **DENIED** for the reasons set forth below.

**I. BACKGROUND**

This case is about Copperas Cove Independent School District's ("CCISD") alleged denial of T.P.'s ("Student") right to a free appropriate public education ("FAPE") by failing to provide Student with comparable services as required under the Individuals with Disabilities Education Act ("IDEA"). ECF No. 35 at 3.

Before Student's family moved to Texas, Student attended public school in North Carolina. A.R. at 667. Student was in general education classes, "Participating with Accommodations" in math, reading, science, social studies, and writing. *Id.* at 634–35. Student had an Individualized Education Program ("IEP") to address his disabilities that included Other Health Impairment ("OHI") for Attention Deficit Hyperactivity Disorder ("ADHD") and a Speech Impairment ("SI"). *Id.* at 629–47. Student received thirty minutes of speech services twelve times per grading period. *Id.* at 635. Student received five, fifteen-minute sessions per week of resource help in writing, and five, thirty-minute sessions per week in reading. *Id.*

## A. Second Grade

On September 27, 2017, Student enrolled in the second grade at an elementary school within CCISD after the family moved to Texas due to military transfer. A.R. at 11, ¶ 25; A.R. at 648. The CCISD elementary school received Student's IEP and evaluations from his previous school in North Carolina. *Id.* at 875. Student's special education case manager and special education teacher ensured that Student received services comparable to his North Carolina IEP when he enrolled. *Id.* at 2222:10–13; A.R. at 2255:14–2256:18.

On October 20, 2017, CCISD held a Transfer Admission Review Dismissal ("ARD") Committee meeting. *Id.* at 648–83. The meeting consisted of a Review of Existing Evaluation Data ("REED"). *Id.* at 648. This REED review includes: (1) a review of evaluations and information provided by the parents of the child; (2) performance on curriculum-based, local or state assessments, and classroom-based observations; and, (3) observations by teachers and related service providers. *Id.* The ARD Committee concluded that Student exhibited a need for specially designed instruction in the areas of reading comprehension and language arts, as well as math. *Id.* at 678. CCISD addressed Student's individual needs accommodating him with

support in language arts, reading, math, social studies, and science. *Id.* at 668. Student's goals and accommodations remained comparable to what he received in North Carolina. *Id.* at 2256:12–18.

On October 27, 2017, Student's Schedule of Services" became effective. *Id.* at 673. The Schedule of Services included general education in language arts and writing for forty-five minutes per day, and math for forty-five minutes per day. *Id.* Special education included math support for thirty minutes per day and specialized reading support for thirty minutes per day. *Id.* Speech therapy was provided thirty minutes, five times per six-week grading period in the speech therapy room. *Id.* at 674. CCISD used the Fountas & Pinnell Assessment ("F&P") to assess a student's progress in reading skills. *Id.* at 2026:19–22. F&P is a curriculum-based, criterion-referenced assessment that tests reading skills. *Id.* at 2026:15–2027:1. At the beginning of the year, Student was assessed at an F&P Level F and a comprehension level of E. *Id.* at 2030:20–25; A.R. at563; A.R. at 2031:1–3; A.R. at 563.

On January 30, 2018, the ARD Committee reviewed Student's levels of performance and noted the he still struggled with his reading fluency. *Id.* at 708–20. Amanda P. and Casey P. ("Parents") expressed a desire for dyslexia testing, but CCISD suggested, and Parents agreed to conduct a dyslexia screening instead. *Id.* at 709, 711. A CCISD Reading Interventionist conducted the dyslexia screening on February 15, 2018. *Id.* at 967–74. On April 6, 2018, a Revision ARD Committee meeting convened to discuss the results of the screening. All parties agreed that Student would undergo dyslexia testing, and Parents provided consent. *Id.* at 721. The dyslexia assessment test, conducted on May 18, 2018, revealed that Student qualified for dyslexia services. *Id.* at 551–53.

At the end of the school year, Student's progress reports showed that he made progress on all IEP goals and received passing grades in all academic areas. *Id.* at 793; A.R. 22, ¶ 101. Student's end of the year F&P testing on May 23, 2018, demonstrated objective progress in reading. A.R. at 2031; 563; A.R. 27 at 27, ¶ 133).

## B. Summer of 2018

On July 18, 2018, Parents requested an Independent Educational Evaluation ("IEE") of Student by Jason Craig in all areas of suspected disability and need, including but not limited to Autism, Specific Learning Disability, Other Heath Impairment, Occupational Therapy, Assistive Technology, and any other area of suspected disability. A.R. at 1071. CCISD contracted with Mr. Craig as the evaluator for the psychoeducational IEE and Believe Pediatric Therapy Services for the speech IEE. *Id.* at 1062.

Parents provided Student tutoring through the Sylvan Learning Center over the summer, and the military provided Applied Behavior Analysis ("ABA") services. *Id.* at 23. Despite the 150 hours of one-on-one instruction, Student did not demonstrate gains in learning when he returned for third grade. *Id.*

## C. Third Grade

On September 17, 2018, CCISD held an ARD Committee meeting and determined that Student qualified for dyslexia services. *Id.* at 750. The services were to be provided in the general education setting during the school year. *Id.* Student received 45 minutes per day, four days per week, dyslexia instruction using the Wilson Reading System along with resource and inclusion services. *Id.* at 746; A.R. at 17776: 18–20. Student also received the use of assistive technology daily as needed and thirty minutes of speech therapy, four times per six-week grading period. A.R. at 746–47.

Student's IEP identified weaknesses in reading fluency and comprehension, in writing legibly, and in math with the expanded form of numbers and word representation of numbers. *Id.* at 728–30. Student made progress in developing reading skills toward grade level. *Id.* at 659, 728.

Parents expressed concern over Student's handwriting at the ARD Committee Meeting on September 17, 2018. CCISD's Reading Specialist offered to allow Student to stay after school to practice his handwriting with her. *Id.* at 750; A.R. at 1735:7–1736:20.

### D. Parents Request Due Process Hearing

Three days after the ARD Committee meeting, Parents filed a request for a due process hearing with the Texas Education Agency. A.R. at 67–84. The due process hearing was held December 12-14, 2018, before Special Education Hearing Officer ("SEHO") Ray E. Green. *Id.* at 4. In the due process proceedings, Parents alleged that CCISD committed procedural and substantive violations of the IDEA and denied Student a FAPE. *Id.* at 4. Parents alleged that CCISD failed to evaluate Student in all areas of suspected disability, failed to identify him as eligible for special education services as a student with a Specific Learning Disability ("SLD"), improperly denied Parents an IEE at CCISD's expense, and denied speech therapy and phonics/reading comprehension services during his first month in school for second grade. *Id.* at 4, ¶¶ 1–5.

Following the three-day hearing, the SEHO issued a decision concluding that Parents did not meet their burden to show that CCISD's program for Student failed to provide a FAPE, or CCISD violated the IDEA. *Id.* at 48. Despite the SEHO finding that the findings of facts and conclusions of law weighed in favor of CCISD, the SEHO granted Parents relief. *Id.* at 1–64.

The SEHO ruled against Parents on every issue raised at the due process hearing, including: (1) CCISD did not violate the IDEA and deny Student a FAPE; (2) CCISD did not violate the IDEA by failing to evaluate Student in all areas of suspected disability and need; (3) CCISD did not violate the IDEA by failing to grant Parents' request for an Independent Educational Evaluation; (4) CCISD did not fail to identify Student as eligible for special education and related services; and (5) CCISD did not violate the IDEA by failing to provide Student with comparable services in speech therapy and phonics/reading comprehension intervention. *Id.* at 58. The SEHO confirmed that Parents did not meet their burden of proof. *Id.* at 59.

The SEHO ordered CCISD to convene an ARD Committee meeting to provide an appropriate plan for the provision of services to Student during the 2019 summer to address Student's deficits in Basic Reading, Reading Fluency, Reading Comprehension, and Written Comprehension. ECF No. 1-2 at 62. Student attended CCISD's Ranger Reading Camp between July 10 and July 25, 2019. ECF No. 34-1 at 13. In addition to the Camp, CCISD provided Student daily dyslexia services. *Id.* Student also worked on Reading and Language Arts goals contained in his IEP. *Id.* CCISD complied with the SEHO's order to provide summer dyslexia support to Student. *Id.* Two months after the start of the 2019-2020 school year, Student moved back to North Carolina. *Id.*

### E. Procedural Background

On March 7, 2019, Parents sued CCISD on behalf of Student, appealing the decision of the SEHO. ECF No. 1 at 1. Plaintiffs challenged the following findings of the SEHO: (1) the Hearing Officer's finding that no procedural violations of the IDEA occurred; (2) the Hearing Officer's finding that no substantive violations of the IDEA occurred; (3) CCISD did not deny

Student a FAPE; (4) CCISD did not violate the IDEA; (5) the Hearing Officer's rejection of an award for compensatory educational services; and (6) the Hearing Officer's rejection of an award to Parents' reimbursement in the amount of $7,451.00 for summer academic tutoring services. *Id.* at 51–52. The Parties filed cross-motions for summary judgment on February 21, 2020. *See* Pls.' Mot. J. A.R.; Def.'s Mot. J. A.R. The Parties have fully briefed this dispute.

## II. LEGAL STANDARD

The purpose of the IDEA is to ensure children with disabilities receive a "free appropriate public education (FAPE) that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). All school districts within Texas must comply with the IDEA. *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F.*, 118 F.3d 245, 247 (5th Cir. 1997). The IDEA requires states to educate children with disabilities "in the least restrictive environment consistent with [the child's] needs . . . " *Teague Indep. Sch. Dist. v. Todd L.*, 999 F.2d 127, 128 (5th Cir. 1993). The IDEA does not require the school district to provide the best possible FAPE, "nor one that will maximize the child's educational potential." *Michael F.*, 118 F.3d at 247. Instead, the "FAPE must be tailored to each disabled child's needs through an 'individualized education program,' ("IEP") which is a written statement prepared [by a committee consisting of] a 'qualified' and 'knowledgeable' school district representative, a teacher, the child's parents or guardians, and, when appropriate, the child himself." *El Paso Indep. Sch. Dist. v. Richard R.*, 567 F. Supp. 2d 918, 925 (W.D. Tex. 2008) (citing 20 U.S.C. § 1414(d)(1)(B)). In Texas, the committee responsible for preparing a student's IEP is the ARD committee.

Under the IDEA, any party aggrieved by the SEHO's findings and decisions may bring suit in district court. 20 U.S.C. § 1415(i)(2)(A). "Under the IDEA, a federal district court's

review of a [SEHO's] decision is 'virtually de novo.'" *Adam F. ex rel. Robert J. v. Keller Indep. Sch. Dist.*, 328 F.3d 804, 808 (5th Cir. 2003). The court should afford the SEHO's findings "'due weight,' but the district court must arrive at an independent conclusion based on a preponderance of the evidence." *Id.* As a result, even though the court is ruling on summary judgment, the existence of a disputed material fact will not defeat a summary judgment motion. *Reyes v. Manor Indep. Sch. Dist.*, No. A-14-CA-00469, 2016 WL 439148, at *4 (W.D. Tex. Feb. 2, 2016).

The IDEA presumes a school district's IEP is appropriate. *White ex rel. White v. Acension Parish Sch. Bd.*, 343 F.3d 373, 377 (5th Cir. 2003). The party challenging the IEP bears the burden of showing the IEP was inappropriate under the IDEA. *Richardson Indep. Sch. Dist. v. Michael Z.*, 580 F.3d 286, 292 n.4 (5th Cir. 2009). A district court should not substitute its "own notions of sound educational policy for those of the school authorities which [it] review[s]." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 206 (1982). To that end, a district court's task is to determine whether a school district complied with the IDEA and not to second-guess their educational decision making. *R.H. v. Plano Indep. Sch. Dist.*, 607 F.3d 1003, 1010 (5th Cir. 2010).

### III. ANALYSIS

When reviewing a SEHO's decisions, district courts make two determinations. First, courts determine whether the school district complied with the IDEA's procedural requirements. The second inquiry is to determine whether a student's IEP is reasonably calculated to provide meaningful educational benefits. *Rowley*, 458 U.S. at 177. Plaintiffs allege Defendant denied Student a FAPE by violating both the procedural safeguards and substantive provisions of the IDEA.

### A. Procedural Violations

The existence of a procedural violation does not automatically entitle a plaintiff to relief. *Adam J. v. Keller Idep. Sch. Dist.*, 328 F.3d 804, 811–12 (5th Cir. 2003). A plaintiff must also show substantive harm precipitating from the procedural violation. *Id.* Under the IDEA, a plaintiff must show that the procedural violation: (1) impeded the child's right to a FAPE; (2) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE; or (3) caused a deprivation of educational benefits. 20 U.S.C. § 1415(f)(3)(E)(ii). Parents allege CCISD committed, and the SEHO erred in not finding a procedural violation in Student's IEP reevaluation.

Parents argue that since Student was eligible for special education when he started school at CCISD in 2017, the Court should look to the IEP reevaluation procedural requirements for guidance. ECF No. 35 at 17. Under the requirements, the IDEA requires school districts to reevaluate a student, in general, "if the local educational agency determines that the educational or related services needs . . . of the child warrant a reevaluation; or if the child's parents or teacher requests a reevaluation." 20 U.S.C. § 1414(a)(2). The IEP reevaluation shall occur not more frequently than once a year, but it shall occur every three years. *Id.* "School districts must seek to evaluate students with suspected disabilities within a reasonable time after the school district is on notice of facts or behavior likely to indicate a disability." *Dallas ISD v. Woody*, 865 F.3d 303, 320 (5th Cir. 2017).

Additionally, the school must coordinate with the previous schools when a child with disabilities transfers from one public school to another. 34 C.F.R. § 300.304(c)(5). At the same time, if conducting a reevaluation, the evaluation must be sufficiently comprehensive to identify

all of the child's special education and related service needs, whether or not commonly linked to the disability category in which the child has been classified. 34 C.F.R. § 300.304(c)(6).

Parents argue that CCISD had notice of the possibility that Student had an SLD in reading and writing when Student moved into the school district from North Carolina. ECF No. 35 at 18. The school in North Carolina provided CCISD with an IEP and an evaluation that noted Student's specialized instruction requirements in the areas of reading and writing. *Id.* Furthermore, Student's teachers within CCISD reported that Student failed to make appropriate progress in reading. *Id.* Parents subsequently requested an evaluation for reading disability. *Id.*

Instead of following the required procedures and conducting a fully comprehensive test, CCISD conducted a dyslexia "screener" on Student. *Id.* Later in the semester, CCISD conducted a general education dyslexia assessment rather than a full evaluation for an SLD. *Id.*

Parents contend that Student finally received a full SLD evaluation when CCISD consented to Parents' request for an independent evaluation by Jason Craig at the end of 2018. *Id.* at 19. In Mr. Craig's formal evaluation of Student, Mr. Craig recommended Student be found eligible for special education and related services as a student with an SLD in basic reading, reading fluency, reading comprehension, and written expression. *Id.* at 20. Student was only receiving general education dyslexia interventions at the time, and Parents contend that those services do not constitute special instruction under the IDEA. *Id.* at 19. Because of the failure by CCISD to provide a sufficiently comprehensive evaluation, Parents contend that CCISD denied Student an IEP that contained specialized instruction individualized to Student's disabilities and needs. *Id.* at 20. Thus, CCISD deprived Student of educational benefits and impeded Student's right to a FAPE. *Id.* at 20.

In their response, CCISD makes three main counterarguments. First, CCISD argues that they were not on notice that the evaluations or the IEP from the North Carolina school were deficient in any way. ECF No. 37 at 6. CCISD had no evidence to suggest that the IEP was deficient. *Id.* CCISD points out that the statute only requires CCISD to conduct a reevaluation every three years, unless the parent and school district agree the reevaluation is necessary. *Id.*; *See also* 20 U.S.C. § 1414(a)(2). The school in North Carolina conducted the initial evaluation of Student two years before moving to CCISD. CCISD contends that they complied with the statute when they relied upon Student's prior school evaluations and the IEP when creating their own IEP.

Second, CCISD argues that they timely and appropriately evaluated Student for dyslexia. ECF No. 37 at 8. CCISD points out that the IDEA only requires an evaluation when the district suspects that a student has a disability and needs special education. *Id.* Courts then require that the school evaluate within a reasonable time after receiving notice of any behavior that likely indicates a disability. *Id.* at 8–9. In this case, Parents first raised the concern for dyslexia at the end of January 2018 and requested a dyslexia evaluation from CCISD. *Id.* at 9.[1] Parents concern constituted a notice of possible disability, so CCISD initiated a dyslexia screener within two weeks. *Id.* at 10. When the screener indicated reasons to suspect dyslexia, CCISD agreed to conduct the formal dyslexia testing in the middle of May 2018. *Id.* The assessment determined that Student qualified for services due to dyslexia, so CCISD started Student's dyslexia instruction the following school year. *Id.* CCISD contends that these facts suggest that CCISD conducted the tests without unreasonable delay. *Id.* at 11.

---

[1] CCISD explained that dyslexia screeners in its district occur during a student's first-grade year because schools have exposed students to reading instruction by that point. The North Carolina school did not conduct a dyslexia screen despite displaying language problems before Student moved to Texas. ECF No. 37 at 9.

Lastly, CCISD argues that the evaluation by Jason Craig does not support Parents' claims. *Id.* at 12. CCISD contends that Mr. Craig lacked credibility because he recommended accommodations already provided by CCISD to Student. *Id.* Specifically, CCISD highlights that Mr. Craig (1) did not know that Student already received special education services, (2) had not seen Student's existing IEP, and (3) acknowledged that the CCISD's accommodations were appropriate. *Id.* at 12–13.

In their reply, Parents make three counterpoints. First, Parents point out that CCISD committed a procedural violation when CCISD delayed dyslexia testing by instead conducting the dyslexia screener. ECF No. 39 at 4. The procedural violation by CCISD resulted in an eight-month delay in Student's new IEP. *Id.* As a result, Student suffered substantive harm through a denial of services. *Id.* Second, Parents contend that CCISD committed a second violation when CCISD conducted the limited assessment for dyslexia as opposed to evaluation for an SLD. *Id.* While Parents point out that CCISD's dyslexia assessment in May 2018 did not meet the reevaluation requirements, they do not point to any specifics or explain how they substantively harmed Student. *Id.* Lastly, Parents contend that Mr. Craig's evaluation was credible because the SEHO made numerous findings of fact regarding his evaluation and testimony and awarded relief to Parents. *Id.* at 5.

The Court finds that Parents did not show substantive harm to Student from a procedural violation. Moreover, the Court finds that CCISD complied with its obligations under the IDEA. First, although Parents assert that CCISD violated the IDEA procedures when they conducted the dyslexia screener, Parents failed to show that the steps taken by CCISD were inappropriate given the facts and circumstances. Specifically, Student's teacher did not see any indications that Student had dyslexia over the first three months of class. A.R. at 2067:2–2068:3. CCISD

conducted the screener instead of the dyslexia testing because the dyslexia testing is a long process. *Id.* at 1723:18–1724:1. It is CCISD's policy to first conduct a screener and follow up with a test only if needed. While the district must provide the student with a FAPE, deference must be given to the District with respect to the means and method of providing the FAPE. The Court's only proper inquiry is if CCISD ultimately violated the IDEA, not to assess whether a better system exists. *See Rowley*, 458 U.S. at 206. Thus, CCISD did not violate the procedural requirements by conducting the dyslexia screening before the dyslexia test.

Second, although Parents assert that CCISD violated the IDEA procedures because of the eight-month delay for the new IEP, Parents fail to show that CCISD acted with unreasonable delay. *See Dallas ISD v. Woody*, 865 F.3d 303, 320 (5th Cir. 2017) (stating that a three-month period of time between notice and evaluation was reasonable). While the delay in this case is longer than the three-month period in *Woody*, CCISD justified their delay because of (1) holding the dyslexia screening (A.R. at 1345–51), (2) conducting the ARD Committee meeting accessing the results of the screening (A.R. at 1196; A.R. at 721–25), (3) conducting the dyslexia test (A.R. at 551–53), (4) convening for summer break (A.R. at 925–26), and (5) conducting the ARD meeting to access the results of the dyslexia test (A.R. at 727–756).

In contrast, Parents did not dispute any of the specific justifications made by CCISD. The facts provided to the Court suggest reasonableness, with neither CCISD nor Parents reacting with unreasonable delay. *See Dallas ISD*, 865 F.3d at 320. While the reevaluation time from start to finish may have prevented Student from receiving meaningful benefits, CCISD justified their decision-making process without any objections. *Id.* Moreover, CCISD was not idly standing by during this delay. On the contrary, as described above, CCISD acted reasonably, albeit not in the exact sequence Parents preferred. What is considered to be a reasonable time must be evaluated

in context of surrounding circumstances. *See Woody*, 865 F.3d at 317–19. Here, the District, following the steps outlined above, "offer[ed] an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 137 S.Ct. at 999. Accordingly, the Court finds that CCISD complied with the IDEA's timeliness requirement because CCISD justified the reevaluation process.

Finally, even though Parents contend that the dyslexia evaluation constitutes a procedural violation, they failed to show the deficiency of this evaluation. Parents point to statements made in the Independent Educational Evaluation ("IEE") by Mr. Craig, recommending that Student be found eligible for special education. However, the record shows that CCISD was already providing the specific recommendations from Mr. Craig, including information checking, small-group instruction, checking for understanding, repetition, and practicing. A.R. at 1932:1–1933:13; A.R. at 1939:4–16. Parents must show the substantive harm that occurred from the alleged procedural violation. Based on the record, CCISD already built in all the recommended accommodations that Student needed to improve his performance. Without further evidence, the Court cannot conclude that CCISD deprived Student of an educational benefit, impeding his right to a FAPE. Accordingly, Parents have not shown by a preponderance of the evidence that CCISD impeded Student's right to a FAPE or that CCISD caused a deprivation of educational benefits.

Because Parents have failed to show a procedural violation of the IDEA, the Court need not discuss whether the violation led to substantive harm. However, in an abundance of caution, the Court will nevertheless address the substantive appropriateness prong of the IDEA.

**B. Substantive Violations**

For a school district "to meet its substantive obligation under the IDEA [to a child], [the] school district must offer [the child] and IEP [that is] reasonably calculated to enable [the] child to make progress appropriate in light of the child's circumstances." *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S.Ct. 988, 999 (2017). To this end, the child's IEP "must be appropriately ambitious in light of his circumstance." *Id.* at 1000.

The Fifth Circuit identifies four factors to analyze and determine whether a school district substantively denied a student a FAPE:

> (1) the program is individualized on the basis of the student's assessment and performance; (2) the program is administered in the least restrictive environment; (3) the services are provided in a coordinated and collaborative manner by the key "stakeholders"; and (4) positive academic and non-academic benefits are demonstrated.

*Cypress-Fairbanks Indep. Sch. Dist. v. Michael F.*, 118 F.3d 245, 253 (5th Cir. 1997) The Fifth Circuit has not specified how a district court must weigh the *Michael F.* factors. *Richardson Indep. Sch. Dist. v. Michael Z.*, 580 F.3d 286, 293 (5th Cir. 2009). Instead, the factors are general indicators of the IEP's appropriateness intended to guide a district court in the inquiry of whether an IEP provided an educational benefit. *Id.* at 294.

**1. Student's IEP was sufficiently individualized on the basis of his assessment and performance.**

Under IDEA, the IEP is the "means by which special education and related services are tailored to the unique needs of a particular child." *Endrew F.,* 137 S. Ct. at 994. The IEP should include a statement of the child's "present levels of academic achievement and functional performance ("PLAAFP"). 34 C.F.R. § 1414(d)(1)(A)(i). The PLAAFP includes "how the child's disability affects the child's involvement and progress in the general education curriculum." *Id.* The IEP should also include "a statement of measurable annual goals, including

academic and functional goals," along with a "description of how the child's progress toward meeting the annual goals . . . will be measured." *Id.* The IEP must describe the "special education and related services . . . that will be provided so that the child may "advance appropriately toward attaining the annual goals" and, when possible, "be involved in and make progress in the general education curriculum." *Id.*

An IEP is sufficiently individualized when multiple assessments are conducted of the student, the ARD committee considers these assessments and parent and teacher input in developing the student's IEP, accommodations and modifications are made based on the student's test performance and parent input, and the IEP goals are revised or added to based on the new assessment data. *Z.C. v. Killeen Indep. Sch. Dist.*, No. W:14-CV-086, 2015 WL 11123347, at *6 (W.D. Tex. Feb. 17, 2015).

Parents argue that Student's IEP was not individualized while he was in second or third grade. EFC No. 21, 22. In second grade, when CCISD received evaluation results from the North Carolina school, Parents contend that CCISD did not include those evaluations in Student's new IEP. *Id.* at 21. Specifically, CCISD did not provide any targeted individual instruction or include any baseline performance information. *Id.* As a result, Student's PLAAFP statements are generic and unclear, and the IEP contains deficient goals. *Id.* In third grade, after Student's dyslexia assessment, Parents contend that CCISD did not individualize the PLAAFP because CCISD did not incorporate the word dyslexia within the PLAAFP statement. *Id.* at 23. As a result, Student's IEP goal for reading became more generic, less individualized, and less ambitious than his second-grade plan. *Id.*

In their response, CCISD argues that Student's PLAAFP statements directly related to his individualized goals in his IEP in both second and third grade. ECF No. 14. Specifically,

Student's PLAAFP statements related to reading weaknesses in fluency and comprehension. *Id.* Student made progress on these IEP goals as indicated on his final report card for second grade. *Id.* at 14–15. In their reply, Parents argue that Student's second-grade reading goals for the year were unrealistic and unattainable. When CCISD adjusted Student's IEP in third grade, Student's PLAAFP did not even mention that he had dyslexia.

The Court finds that Parents failed to meet their burden that Student's IEP was not sufficiently individualized. Moreover, the record shows that Student's IEP was sufficiently individualized. Student's second-grade PLAAFP statement includes a description of how Student's disability affected his involvement and progress. A.R. at 657–83. The PLAAFP included measurable annual goals with detailed descriptions of how Student could obtain these goals. *Id.* Specifically, Student's goals included a reading goal that targeted fluency and comprehension, and a writing goal that addressed legibility, punctuation, and capitalization. A.R. at 664–65. Student's PLAAFP provided specific services, including specialized instruction in reading for thirty minutes per week. A.R. at 673. When Student's dyslexia assessment results came back, CCISD modified the IEP goals, and they provided different services. A.R. at 728–36. Accordingly, the Court finds that Student's IEP was individualized and that the first *Michael F.* factor weighs in favor of CCISD.

**2. Student's IEP was administered in the least restrictive environment.**

Parents concede that this factor is not at issue in this proceeding. ECF No. 35 at 26. The Court agrees. Accordingly, the second factor weighs in favor of CCISD

**3. Student's IEP was coordinated and collaborative.**

This factor is satisfied when a variety of individuals, including persons with personal relationships to the student and school district employees, work together to develop the student's

IEP. *Michael F.*, 118 F.3d at 253. A party challenging the implementation of an IEP must show more than a *de minimus* failure to implement all elements of that IEP. *Houston Indep. Sch. Dist. v. Bobby R.*, 200 F.3d 341, 349 (5th Cir. 2000). Instead, the challenging party must demonstrate that the school board or other authorities failed to implement substantial or significant provisions of the IEP. *Id.* With this approach, the school districts are afforded some flexibility in implementing IEPs, but they are still held accountable for material failures. *Id.*

Parents argue that Student's IEP was not coordinated or collaborative while Student was in second and third grade because the staff members did not communicate educational programing, the parents could not collaborate during the ARD process, and the parents could not participate in the development of Student's educational plan. ECF No. 35 at 24–26.

In the District's response, CCISD argues that the evidence indicates extensive participation between CCISD and Parents. ECF No. 37 at 16. Additionally, CCISD contends that the record shows that CCISD included Parents in multiple meetings with CCISD to discuss Student's programming. *Id.* at 17. In their reply, Parents point out that a complete lack of communication existed between the members of the CCISD staff who were implementing Student's IEP. ECF No. 39 at 9.

The Court finds that CCISD provided educational services in a coordinated and collaborative manner. The record shows that CCISD worked with Parents to ensure a smooth transition from North Carolina to CCISD. A.R. at 2256:1–11. Parents actively participated in every ARD Committee meeting and indicated agreement at the end of each one. A.R. at 678–680; 698; 707; 709–711; 723; 752–753. Student's educational plan included substantial participation by various professionals. A.R. at 648–756. CCISD provided progress reports that allowed teachers and Parents to monitor progress. A.R. at 793–859. Parents did not show the

Court how CCISD failed to implement substantial or significant provisions of the IEP due to various communication errors by CCISD staff. The Court is persuaded that sufficient coordination and collaboration took place in implementing Student's educational services. Accordingly, the Court finds that the third factor weighs in favor of CCISD.

### 4. Student's IEP demonstrated some educational and academic benefit.

Although no factor is dispositive, this fourth factor "is 'one of the most critical factors in [the *Michael F.*] analysis.'" *R.P. ex rel. R.P. v. Alamo Heights Idep. Sch. Dist.*, 703 F.3d 801, 814 (5th Cir. 2012) (citing *Houston Idep. Sch. Dist. V. V.P. ex rel Juan P.*, 582 F.3d 576, 588 (5th Cir. 2009)). Courts determine whether academic and non-academic benefits resulted from a student's IEP by looking to the progress or regress of the individual student, rather than by comparison to the academic progress achieved by the student's peers. *Bobby R.*, 200 F.3d at 349.

The *Bobby R.* court found that academic benefits were shown where the student's test scores improved and the student progressed grade levels each year. *Id.* at 349–50. Notably, the court found that the fourth factor was met where only an educational benefit had been demonstrated. Similarly, courts have found that the fourth factor is met where only non-academic benefits are demonstrated. *A.B. v. Clear Creek Indep. Sch. Dist.*, No. 4:17-CV-2382, 2018 WL 4680564, at *5 (S.D. Tex. Sept. 28, 2018), *aff'd*, 787 F.App'x 217 (5th Cir. 2019).

Parents argue that Student did not make meaningful progress in reading in either second grade or third grade. ECF No. at 11–13. Specifically, Parents point to Student's test scores through both the F&P assessment and iReady. *Id.* at 10. In F&P, Student began second grade at level F, which is equivalent to an early first-grade level. *Id.* Halfway through third grade, Student scored at a Level H, which is equivalent to "meeting expectations" for a student in first

grade at mid-year. *Id.* at 13. Parents contend that this lack of progress indicates that Student showed de minimus academic benefit. *Id.*

In its response, CCISD contends that Parents are looking at the results of the academic progress from a narrow scope. ECF No. 37 at 19–21. Specifically, CCISD admits that Student had significant reading deficiencies, but Student received academic and non-academic benefits from his specialized instruction. *Id.* at 19. The reading scores showed objective progress, and Student also showed improvement in his math and writing skills. *Id.* at 20. Overall, Student made appropriate academic, behavioral, and social progress in light of his unique circumstances. *Id.* at 21.

In their reply, Parents focus on the lack of meaningful progress in Student's reading scores. ECF No. 39 at 10. Parents point to the testimony of a dyslexia expert who testified that she would have expected more progress than what CCISD documented. *Id.*

The Court finds that Student demonstrated positive academic and non-academic benefits. While Student's progress in reading was slower than expected, Student did make objective improvements and showed progress in other areas of school. A.R. at 660, 731; A.R. at 2290:17–20; A.R. at 2262:15–24; A.R. at 2279:6–14; A.R. at 2264:15–2268:8. When looking at the results as a whole, Student demonstrated objective progress in all areas. Accordingly, the Court finds that Parents failed to show, by a preponderance of the evidence, that CCISD denied a FAPE due to a lack of progress in academic and non-academic areas. Accordingly, the Court finds that the fourth factor weighs in favor of CCISD.

For these reasons, the Court finds that CCISD complied with the substantive requirements of the IDEA.

## IV. CONCLUSION

Because of the foregoing reasons, the Court finds that CCISD complied with the procedural and substantive requirements of the IDEA. Accordingly, the Court **GRANTS** Defendant's Motion for Judgment of the Administrative Record and **DENIES** Plaintiffs' Motion for Judgment on the Administrative Record. Pursuant to Federal Rule of Civil Procedure 58, the Court will issue its Final Judgment in a separate Order.

**SIGNED** this 14th day of April 2020.

ALAN D ALBRIGHT
UNITED STATES DISTRICT JUDGE